## AFFIDAVIT OF SPECIAL AGENT JUAN YERBA
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Juan J. Yebra, being first duly sworn, hereby depose and state as follows:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent with the Drug Enforcement Administration (DEA), duly appointed according to law and acting as such. I have been a Special Agent with the DEA for three years. My assignments have included investigating criminal violations of federal narcotics offenses related to the possession and distribution of controlled substances.

2.      As a Special Agent with the DEA, I have received extensive training in the field of drug investigations and enforcement. I successfully completed the DEA Basic Agent Training Academy, located in Quantico, Virginia. Since joining the DEA, I have received training in narcotics identification, methods of packaging, and distribution of drugs. I have participated in investigations related specifically to the possession and distribution of drugs, including methamphetamine and fentanyl. I have also participated in various aspects of investigatory work, including but not limited to surveillance and the controlled purchases of illicit drugs. I have participated in the execution of drug search warrants and drug related arrests.

3.      I have also worked directly with confidential sources and informants to conduct controlled purchases of controlled substances. During these investigations, I have listened to and reviewed communications between individuals involved in, or suspected to be involved in, the distribution of controlled substances. As a result of these investigations, I also have experience in debriefing defendants, informants, participants, and various persons directly involved in buying and distributing controlled substances.

4.      Prior to my employment with the DEA, I was employed by the United States Border Patrol as a Border Patrol Agent for over 12 years, during which time I also participated in

investigations involving narcotics offenses relating to the possession and distribution of controlled substances and illegal human smuggling. While working in this capacity, I conducted or participated in surveillance, intelligence collection and analysis, debriefings of informants, reviews of recorded conversations, and participated in investigations that included the interception of electronic communications.

5. Through my training, education, and experience, I have become familiar with the way illegal drugs are transported, stored, and distributed; the methods of payment for such drugs; the laundering of drug proceeds; and the terminology and coded language used by drug traffickers. I am also familiar with the use of communication devices by drug traffickers, the patterns of activity of drug traffickers, and the methods, language, and terms that are used by drug traffickers to disguise drug trafficking and the source and nature of the profits they earn from their illegal activities. Based on my training and experience, I am familiar with slang and jargon utilized in the distribution of controlled substances. I am also familiar with drug trafficker's methods of transporting bulk cash proceeds of their drug distribution activities and I have conducted controlled purchases of illegal substances utilizing a confidential source.

6. I am the one of the case agents and officers investigating Johan GRULLON-ANTONIO (herein, "GRULLON") for distributing and possessing to distribute narcotics in violation of Title 21 U.S.C. § 841(a)(1) and for conspiracy to do so in violation of Title 21 U.S.C. § 846 (herein, the "Target Offenses").

7. The statements contained in this affidavit are based on my personal observations and review of records, my training and experience, as well as information obtained from other agents, investigators, and witnesses. Since this affidavit is being submitted only for the purpose of securing a criminal complaint, I have not included every fact known to me concerning this

investigation. Rather, I have set forth only the facts necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses as set forth in Attachment B, exist at the locations described in Attachments A-1 and A-2.

8. Unless indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### *CONFIDENTIAL SOURCES OF INFORMATION*

1. This investigation has made use of two Confidential Witnesses. Below is a description of the Confidential Witnesses.

#### *Confidential Witness One*

2. Confidential Witness One (herein, "CW-1") is willing to testify publicly and has been providing reliable information to the DEA and ATF since the Spring of 2025. CW-1 has provided information and a phone number for a narcotics distributor located and operating in Springfield, MA. This person was later identified as GRULLON. CW-1 communicated directly with GRULLON via phone and introduced GRULLON to Confidential Witness Two, described below. CW-1's information to date has been reliable and led to positive investigation results.

3. CW-1's motivation to cooperate with law enforcement is to mitigate his/her sentence resulting from a criminal case. CW-1 and the agency prosecuting him have a signed plea agreement promising his/her cooperation, including full-disclosure of information regarding criminal activity known to him/her. CW-1 has not been paid by the government for providing any information. Based on my review of CW-1's criminal history, I am aware that CW-1 was convicted in Massachusetts for possession with the intent to distribute cocaine and has a pending case for trafficking between 100 and 200 grams of cocaine. As of the writing of this affidavit, this case is pending.

3

*Confidential Witness Two*

4.  Confidential Witness Two (herein "CW-2") is willing to testify publicly and has been providing reliable information to federal law enforcement agencies since 2008. During that time, CW-2 has made multiple controlled purchases of drugs from drug distributors/dealers., CW-2 has testified in two federal trials in his/her capacity as a cooperating witness. CW-2 is cooperating with the DEA and ATF in return for a monetary reward.  I am aware of that CW-2 has been convicted of depraved indifference murder, distributing narcotics; carrying a pistol without a permit; assault; burglary, and other minor offenses.

### *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

1.  Since June 2025, the DEA and the Bureau of Alcohol Tobacco and Firearms ("ATF") have been investigating GRULLON and his drug trafficking organization, which involves numerous other identified and unidentified individuals. Through this investigation the DEA and ATF are aware of GRULLON's drug trafficking activity in Western and Central Massachusetts.

2.  On June 20, 2025, I met with ATF SA Daniel Prather, of the ATF's Springfield, MA Office, CW-1 and CW-2.  CW-1 explained to SA Prather and me that CW-1 knew a source-of-supply with a drug trafficking organization conducting operations out of the Bronx, New York.  With information provided by CW-1, investigators tentatively identified this source-of-supply. CW-1 explained that he had purchased drugs from this source-of-supply and others in his/her drug trafficking organization. CW-1 further explained that this Bronx-based drug trafficking organization was distributing narcotics in Massachusetts though a distributor located in the Springfield area. This distributor was later identified as GRULLON. CW-1 agreed to speak with CW-1's Bronx narcotics source-of-supply and GRULLON to arrange for CW-2 to

purchase narcotics from GRULLON. At the direction of investigators, CW-1 brokered a drug purchase between CW-2 and GRULLON.

3. During the week of June 29, 2025, ATF coordinated with CW-1 and CW-2 to set up a controlled purchase of fentanyl from GRULLON. At the direction of investigators, CW-1 communicated with GRULLON to arrange the type, amount, and price of narcotics for the controlled purchase. CW-1 texted CW-2 that the controlled purchase from GRULLON would be for "50 packs of fetty" for $3,250 and "100 perk 30's" for $1,000.[1] Based on my training and experience, I know that: "fetty" is street slang for fentanyl; "perk" is street slang for Percocet, and; "pack" is street slang for a package of 100 individually packaged user doses. CW-1 texted with GRULLON and set up the controlled purchase at 25 Colonial Avenue, Springfield, MA during the week of July 7, 2025. CW-1 sent ATF a screenshot of these messages.[2]

### *First Controlled Purchase from GRULLON*

4. During the week of July 7, 2025, CW-2 completed a controlled purchase of fentanyl and fentanyl pills from an individual later identified as GRULLON. Prior to the controlled purchase, ATF and DEA agents met with CW-2 at a predetermined location and searched CW-2. CW-2 did not have any drugs, drug paraphernalia, or large sums of money. The ATF agents then equipped CW-2 with electronic surveillance devices which recorded audio and video for the duration of CW-2's travel and the drug transaction itself. An electronic surveillance device also transmitted a real-time feed to ATF agents. ATF agents provided CW-2

---

[1] CW-2 sent investigators screenshots of text messages between him/her and CW-1. CW-2 has been instructed to preserve all text messages.

[2] CW-1 sent investigators screenshots of text messages between him/her and GRULLON. CW-1 has been instructed to preserve all text messages.

with $4,250 in U.S. currency. ATF agents recorded and documented the corresponding serial numbers prior to providing the U.S. currency to CW-2.

5. At the direction of ATF agents, CW-2 departed the location in CW-2's own vehicle. ATF SAs Prather and Karleigh Gause followed CW-2 in their vehicle.[3] Prior to the controlled purchase, CW-1 and CW-2 spoke on the phone and CW-1 told CW-2 that GRULLON currently had a mohawk. CW-2 used speakerphone to have this conversation with CW-1 and their conversation was recorded by electronic surveillance equipment in CW-2's vehicle. This information was relayed to law enforcement agents who were conducting surveillance around the planned drug transaction at 25 Colonial Avenue, Springfield, MA.

6. Close in time to CW-1 and CW-2's phone call, ATF Task Force Officer (TFO) Cody Guilbault observed a man with a mohawk carrying a bag. He was wearing a black shirt, multi-colored shorts, and tall white socks. The man was walking on Suffolk Street, coming from the area of Marlborough Street and walking towards Wilbraham Road. CW-2 advised agents that CW-2 saw an individual with a mohawk and a bag walking up the street to where CW-2 was parked. This individual was later identified as GRULLON.

7. CW-2 made contact with GRULLON, who then got into the front passenger seat of CW-2's vehicle and placed his bag on the front passenger floor. Once in the vehicle, GRULLON used his cell phone to make a video call to an unknown third-party male (herein,

---

[3] In each of the controlled purchases described herein, CW-2 acted at the direction and under the supervision of investigators. Investigators' directions were communicated to CW-2 in person or over communication devices. I base the summaries of each of the controlled purchases herein on: audio and video recordings of the transactions, recorded conversations between CW-1, CW-2 and/or GRULLON, observations of investigators, and descriptions provided by CW-2.

"UM1"). Because GRULLON's ability to speak English was limited, UM1 translated the conversation between GRULLON and CW-2. GRULLON and CW-2 (with UM1 translating) discussed the price, amount, and type of narcotics involved in the transaction. CW-2 and GRULLON determined that the final price would be $2,250 for what investigators later determined to be 725 grams of suspected fentanyl (including packaging) and 12.5 grams of suspected pressed fentanyl pills (including packaging). This amount was less than what CW-2 and GRULLON had originally agreed upon. UM1 and GRULLON informed CW-2 that GRULLON did not have the originally agreed-upon amount because GRULLON previously sold a portion of it. GRULLON hung up with UM1 and CW-2 asked GRULLON for his phone number. GRULLON provided his number in response. CW-2 then handed GRULLON the $2,250.

8. GRULLON then asked CW-2 to drive him to a strip mall on the corner of State Street and Hayden Avenue, approximately half a mile west of 128 Middlesex Street in Springfield, MA (hereinafter referred to as "128 Middlesex Street"). ATF agents observed CW-2 pull into the parking lot of the strip mall and observed GRULLON exit CW-2's vehicle. CW-2 then drove to a predetermined location where CW-2 met with agents before the controlled purchase. ATF SA Prather then recovered the bag of narcotics delivered by GRULLON from the back seat of CW-2's vehicle. The bag contained multiple "packs" of suspected fentanyl and a small bag of blue pills suspected to be pressed fentanyl. SA Prather took custody of the bag of narcotics and CW-2 returned the unspent $2,000 to SA Gause, as witnessed by SA Prather.

9. Simultaneously, investigators continued surveillance of GRULLON and observed him depart the strip mall at the corner of State Street and Hayden Avenue. He walked east on State Street and entered and exited multiple store fronts. DEA SA Austin Orszulak then observed

7

GRULLON walk up the south side of the residence at 128 Middlesex Street, but lost view of GRULLON before he entered the residence.

10. After the drug transaction was complete, ATF SA Prather and SA Gause watched the surveillance video and listened to the audio recording. They observed that GRULLON had an identification card on the back of his phone case. The back of the card had the name GRULLON ANTONIO JOHAN on it. SA Prather and SA Gause accessed a law enforcement database and queried this name. The search revealed a Massachusetts driver's license for a "Johan Grullon." SA Prather and SA Gause compared the individual depicted in that driver's license photo (*see*, Attachment A-2) to video footage captured inside CW-2's vehicle during the narcotics purchase and determined that it was the same individual, GRULLON.

11. On July 28, 2025, ATF SA Gause and SA Marc Maurino transported the suspected fentanyl and pills to the Commonwealth Interstate Narcotics-Reduction Enforcement Team (CINRET) barracks for field testing. CINRET Trooper Joshua Kopeski field-tested the packs and blue pills with a Rapid Response test kit and both field-tested presumptive positive for fentanyl. ATF SA Gause photographed the results.

### *Second Controlled Purchase from GRULLON*

12. During the week of July 28, 2025, investigators completed a second controlled purchase of suspected fentanyl from GRULLON utilizing CW-2. ATF special agents coordinated with CW-2, who communicated with GRULLON using the cell phone number GRULLON previously provided, regarding another purchase of fentanyl. CW-2 arranged with GRULLON to purchase 50 "packs" of fentanyl for $3,250. They planned to meet near 14 Wellington St, Springfield, MA during the week of July 28, 2025.

13. During the week of July 28, 2025, ATF and DEA agents met with CW-2 at a predetermined location and searched CW-2. CW-2 did not have any drugs, drug paraphernalia, or large sums of money. The ATF agents then equipped CW-2 with electronic surveillance devices which were activated and recording audio and video during CW-2's travel and the drug transaction itself. An electronic surveillance device also transmitted a real-time feed to ATF agents. ATF agents provided CW-2 with $3,250 in U.S. currency. ATF recorded and documented the respective serial numbers of the U.S. currency prior to providing it to CW-2.

14. CW-2 departed the predetermined location in CW-2's own vehicle. SA Gause and ATF SA Brian Meehan and I followed in our vehicle. CW-2 drove to the area of 14 Wellington Street and texted GRULLON "Here…" to which GRULLON responded by a text that read, "Okay" and "3 min," indicating that he would be arriving at 14 Wellington Street shortly to conduct the drug transaction.[4]

15. At the same time, DEA TFO Scott Schuster was conducting surveillance outside of 128 Middlesex Street – the address to which GRULLON was observed returning after the first drug transaction was completed. TFO Schuster observed GRULLON walking from the vicinity of 128 Middlesex Street towards 14 Wellington Street. DEA SA Anthony Fontanella, also conducting surveillance in the area, observed GRULLON carrying a small grocery bag in his hand. CW-2 then told agents that CW-2 observed GRULLON approaching CW-2's vehicle. GRULLON then entered the front passenger side of CW-2's vehicle.

---

[4] Investigators reviewed, documented, and stored the text messages between CW-2 and GRULLON. Investigators confirmed that CW-2 sent the text messages to GRULLON.

16. Once in the vehicle, GRULLON told CW-2 to start driving and directed CW-2 through the neighborhood. At that time, GRULLON placed a video call on his cell phone to an individual appearing to be UM1. UM1 translated for GRULLON and CW-2. Through UM1, GRULLON and CW-2 discussed the price, amount, and type of narcotics. CW-2 and GRULLON agreed to a final price of $3,250 for 50 "packs" of fentanyl. CW-2 paid GRULLON the $3,250 and placed the bag in the back seat of CW-2's vehicle. UM1 then asked CW-2 about possibly purchasing "ice" in the future. CW-2 said they would talk about it in the future. UM1 specifically said that he was talking about selling "meth." Based on my training and experience, I know that "ice" and "meth" are street slang for methamphetamine. CW-2 told UM1 that CW-2 would get back to UM1 about purchasing methamphetamine.

17. GRULLON then asked CW-2 to drive him to the bodega on the corner of State Street and Hancock Street. ATF and DEA agents observed CW-2 drive GRULLON to that location. GRULLON exited the vehicle and CW-2 informed investigators that CW-2 had dropped GRULLON off at the bodega. CW-2 then departed the bodega and met with agents at a predetermined location. Upon CW-2's arrival, ATF SA Gause and SA Meehan recovered the grocery bag GRULLON gave to CW-2 from the back seat of CW-2's vehicle. The bag contained 50 "packs" of suspected fentanyl that were hidden inside of a Ritz Crackers box and a Goya Soda Crackers box. SA Meehan took custody of the narcotics, as witnessed by SA Gause and SA Yebra.

18. Members of ATF and DEA continued surveillance of GRULLON and watched him return to 128 Middlesex Street. TFO Schuster observed GRULLON use a key to enter the first-floor, side door entrance - located on the south side of 128 Middlesex Street and watched as he entered the residence. I confirmed via fixed video monitoring device, installed and recording

in front of 128 Middlesex Street, that GRULLON approached the residence and took the walkway leading to the side door entrance.

19. On August 4, 2025, ATF SA Gause and SA Marc Maurino transported the suspected fentanyl to the Commonwealth Interstate Narcotics-Reduction Enforcement Team (CINRET) barracks for field testing. CINRET Trooper Joshua Kopeski field-tested the packs with a Rapid Response test kit and it field-tested presumptive positive for fentanyl. ATF SA Gause photographed the results.

### *Third Controlled Purchase from GRULLON*

20. During the week of August 4, 2025, CW-2 completed a third controlled purchase of suspected fentanyl from GRULLON. At ATF's direction, CW-2 messaged GRULLON on the phone and arranged to purchase an additional 50 "packs" of fentanyl for $3,250. CW-2 and GRULLON agreed to meet near 79 Bristol Street, Springfield, MA to complete the drug transaction.

21. During the week of August 4, 2025, ATF and DEA agents met with CW-2 at a predetermined location and searched CW-2 before the controlled purchase. CW-2 did not have any drugs, drug paraphernalia, or large sums of money. The ATF agents then equipped CW-2 with electronic surveillance devices which were activated and recorded audio and video during CW-2's travel and the drug transaction itself. An electronic surveillance device also transmitted a real-time feed to DEA and ATF agents. ATF agents provided CW-2 with $3,250 in U.S. currency. CW-2 departed the predetermined location in CW-2's own vehicle, followed by ATF SAs Karleigh Gause and Daniel Prather.

22. At the same time, DEA TFO Schuster was conducting surveillance outside of 128 Middlesex Street – the residence to which GRULLON returned after the first two controlled

purchases and from which GRULLON exited before the second controlled purchase. TFO Schuster observed GRULLON on the second-floor, side entrance balcony on the south side of 128 Middlesex Street. TFO Schuster observed GRULLON go back inside, come out to the balcony a second time, and then come out of the side entrance located on the first-floor door on the south side of the house. TFO Schuster described GRULLON was wearing a black shirt and carrying a white shopping bag. TFO Shuster observed GRULLON leaving 128 Middlesex Street and begin walking in the direction of Wilbraham Road. CW-2 then told agents that CW-2 observed GRULLON walking towards CW-2's vehicle. GRULLON then entered the front passenger-side door of CW-2's vehicle. Investigators observed GRULLON enter the vehicle via the real-time video feed from the electronic surveillance equipment in CW-2's car.

23. Once inside the vehicle, GRULLON told CW-2 to start driving and directed CW-2 through the neighborhood. GRULLON then placed a call to an individual appearing to be UM1. UM1 again translated for GRULLON and CW-2. During the conversation with UM1, CW-2 paid GRULLON the agreed-upon sum of $3,250. GRULLON handed a white shopping bag to CW-2, who then put the bag in the back seat.

24. GRULLON then told CW-2 to drop him off at the bodega on the corner of State Street and Hancock Street. CW-2 then drove GRULLON to the bodega and GRULLON got out of the vehicle. CW-2 then returned to the predetermined meeting location. Via the fixed video monitoring device, I observed GRULLON walking south on Middlesex Street carrying several grocery bags. I observed GRULLON walking up the walkway on the south side of 128 Middlesex Street heading towards the side entrance and then out of view.

25. SA Gause and Prather then recovered the white shopping bag that GRULLON delivered to CW-2 from the back seat of CW-2's vehicle. The bag contained 50 "packs" of

suspected fentanyl hidden inside a Chips Ahoy package and a large cannister of powdered iced tea mix. SA Gause took custody of the narcotics as witnessed by SA Prather.

### *Fourth Controlled Purchase from GRULLON*

26.　During the week of September 8, 2025, investigators completed a fourth controlled purchase of suspected fentanyl from GRULLON utilizing CW-2. ATF special agents coordinated with CW-2 to establish a controlled purchase of 30 "packs" of fentanyl for $1,950. Through CW-2, it was established that CW-2 would meet GRULLON in the vicinity of 68 Colonial Avenue, Springfield, MA.

27.　On September 9, 2025, ATF and DEA agents met with CW-2 at a predetermined location and searched CW-2. CW-2 did not have any drugs, drug paraphernalia, or large sums of money. The ATF agents then equipped CW-2 with electronic surveillance devices which were activated and recorded audio and video during CW-2's travel and the drug transaction itself. An electronic surveillance device also transmitted a real-time feed to DEA and ATF agents. ATF agents provided CW-2 with $1,950.00 in U.S. currency. ATF recorded and documented those serial numbers prior to providing it to CW-2.

28.　CW-2 departed the predetermined location in CW-2's own vehicle. ATF SA Gause and SA Prather followed in their vehicle. CW-2 drove to the area of 68 Colonial Avenue and texted GRULLON, "Here." GRULLON responded with a text message that read, "Okay 3 min," indicating that he would be arriving at 68 Colonial Ave shortly to conduct the drug transaction.

29.　At the same time, DEA TFO Scott Schuster was conducting surveillance outside of 128 Middlesex Street – the address where GRULLON was observed before and/or after the

first three controlled purchases. TFO Schuster observed GRULLON come out of 128 Middlesex Street by the side entrance, first-floor door on the south side of the house. TFO Schuster described GRULLON was wearing a Calvin Klein shirt. TFO Schuster observed GRULLON leaving 128 Middlesex Street through the side entrance and then begin walking in the direction of 68 Colonial Avenue. GRULLON then entered the front passenger-side door of CW-2's vehicle.

30. Once GRULLON was inside the vehicle, CW-2 started driving and GRULLON directed CW-2 through the neighborhood. GRULLON then placed a call to an unknown male (herein, "UM2"). UM2 acted as a translator between GRULLON and CW-2, just as UM1 had done in the controlled purchases described *supra*. During the conversation with UM2, CW-2 paid GRULLON the agreed-upon $1,950. GRULLON pulled a black bag and the 30 "packs" of suspected Fentanyl out of his pockets and put the "packs" into the black bag. GRULLON handed the black bag to CW-2, who then put it in the back seat.

31. GRULLON had CW-2 drop him off at the bodega on the corner of State Street and Hancock Street, where GRULLON got out of the vehicle. CW-2 then drove to the predetermined meeting location. Upon meeting CW-2, SA Gause and Prather recovered the black bag that GRULLON provided to CW-2 from the back seat of CW-2's vehicle. The bag contained 30 "packs" of suspected fentanyl. SA Gause took custody of the narcotics as witnessed by SA Prather.

## *CONCLUSION*

32. Based on the information set forth above, I submit there is probable cause to believe that from July 2025 through September 2025, in the District of Massachusetts, Johan GRULLON possessed with intent to distribute fentanyl in violation of Title 21 U.S.C. § 841(a).

Sworn to under the pains and penalties of perjury,

*Juan J. Yerba by JCB*
Juan J. Yerba
Special Agent, DEA

Attested to by the applicant by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____
United States Magistrate Judge Jennifer C. Boal

on  5:57 PM, Sep 19, 2025

15